STATE of Wisconsin, Plaintiff-Respondent-Petitioner,†

v.

Vance FERRON, Defendant-Appellant.

Supreme Court

*No. 96–3425–CR. Oral argument April 9, 1998.—Decided June 26, 1998.*

(Also reported in 579 N.W.2d 654.)

†Motion for reconsideration denied August 25, 1998.

481

For the plaintiff-respondent-petitioner the cause was argued by *Paul Lundsten*, assistant attorney general, with whom on the briefs was *James E. Doyle*, attorney general.

For the defendant-appellant there was a brief and oral argument by *Jane Krueger Smith*, Oconto Falls.

¶ 1. JON P. WILCOX, J. This is a review of a published decision of the court of appeals, *State v. Ferron*, 214 Wis. 2d 268, 570 N.W.2d 883 (Ct. App. 1997), which reversed a judgment of the Circuit Court for Brown County, Peter J. Naze, Judge. The circuit court denied the defendant Vance Ferron's (Ferron) request to strike a juror for cause after the challenged juror said he "would certainly try" and "probably" could set aside his opinion that a criminally accused defendant who was truly innocent would take the stand and testify on his or her own behalf.

¶ 2. There are three issues before us on review. First, we consider the standard of review which appellate courts should employ upon review of a circuit court determination that a prospective juror can be impartial. Second, we apply that standard to the facts of this case to determine whether the circuit court committed an error of law by failing to strike the challenged juror for cause. Finally, we reply to the State's invitation to overrule our recent decision in *State v. Ramos*, 211 Wis. 2d 12, 564 N.W.2d 328 (1997).

¶ 3. Contrary to the court of appeals' decision, we hold that the appellate courts should overturn a circuit court's determination that a prospective juror can be impartial only where the juror's bias is manifest. A juror's bias can appropriately be labeled as "manifest" whenever: (1) the record does not support a finding that the prospective juror is a reasonable person who is sincerely willing to put aside an opinion or prior knowledge; or (2) the record does not support a finding that a reasonable person in the juror's position could set aside the opinion or prior knowledge.

¶ 4. Applying this standard to the facts of this case, we conclude that the record does not support a finding that the prospective juror at issue was a rea-

sonable person who was sincerely willing to put aside his opinion or bias. Accordingly, we hold that Ferron was deprived of his statutorily defined right to due process of law when he was compelled to use one of his peremptory challenges, as provided by Wis. Stat. § 972.03 (1993–94),[1] to correct the circuit court's error.

¶ 5. Because we discern no sound reason either in law or public policy to do so, we also decline the State's invitation to overrule our decision in *Ramos*. Therefore, we modify the decision of the court of appeals and, as modified, we affirm that decision.

¶ 6. The relevant facts are not in dispute. On November 21, 1995, the State of Wisconsin (State) filed a criminal complaint charging Ferron and a codefendant, Timothy Nelson (Nelson), with party to the crime of burglary, in violation of Wis. Stat. §§ 943.10(1)(a) and 939.05. The case was later set for jury trial, where Ferron and Nelson were to be tried as codefendants. On March 26, 1996, the voir dire examination began.

¶ 7. The circuit court posed the first questions to the jury panel. Following these preliminary queries, Christopher Froelich (Froelich), counsel for Ferron, asked a series of questions to determine whether the prospective jurors could serve impartially. Attorney Froelich's questions were followed by the remarks and inquiries of codefendant Nelson's counsel, William

---

[1] All future statutory references are to the 1993–94 version unless otherwise noted.

Wisconsin Stat. § 972.03 provides in pertinent part:

**972.03 Peremptory challenges.** Each side is entitled to only 4 peremptory challenges except as otherwise provided in this section. . . .If there is more than one defendant, the court shall divide the challenges as equally as practicable among them; and if their defenses are adverse and the court is satisfied that the protection of their rights so requires, the court may allow the defendants additional challenges. . . .

Fitzgerald (Fitzgerald). The voir dire examination by Fitzgerald produced the following exchange between the court, Fitzgerald, and prospective jurors James Metzler (Metzler) and M.C. Clark (Clark):[2]

> MR. FITZGERALD: . . .I'm going to argue that the State hasn't provided proof beyond a reasonable doubt that Mr. Nelson is guilty of anything.
>
> Now, keeping that in mind, I may instruct Mr. Nelson that I don't think that he has to take the witness stand. And what I wonder is would any of you think to yourself, well, you're saying the State's case is lousy, but you didn't even have your guy testify so what does that make your case? Yes, Mr. Metzler.
>
> JUROR JAMES METZLER: Well, if your client is innocent, why wouldn't he take the stand?
>
> MR. FITZGERALD: Becauses [sic] the constitution doesn't say he has to.
>
> JUROR JAMES METZLER: Well, if he's innocent, why wouldn't he go up there and tell us he's innocent?
>
> MR. FITZGERALD: Well, without getting into a long exchange about the constitutional rights that we all have, I can only tell you that the Court will instruct you that a defendant has the absolute right to decline to talk to the jury, to talk to the police, to talk to people investigating the crime, and that it might be my advice to him he need not take the stand. And is your questioning an indication that you would hold that against him?
>
> JUROR JAMES METZLER: I think I may.

[2] These exchanges during the voir dire examination appear in the transcript of proceedings dated March 26, 1996. *See* Record on Appeal 39 (Jury Trial March 26–27, 1996).

MR. FITZGERALD: You think you may.

THE COURT: Ladies and gentlemen, here's the instruction. A defendant in a criminal case has the absolute constitutional right not to testify. The defendant's decision not to testify must not be considered by you in any way and must not influence your verdict in any manner. Is there anyone here who cannot follow or would not follow that instruction?

JUROR M.C. CLARK: I would wonder, like he said, why, you know, if he had nothing to hide?

THE COURT: I understand.

JUROR M.C. CLARK: Why he would do that? . . .

THE COURT: All right. Let's get back to the question of the defendant not testifying. I'll read it again. A defendant in a criminal case has the absolute constitutional right not to testify. A defendant's decision not to testify must not be considered by you in any way and must not influence your verdict in any manner.

And I think Mr. Metzler's reaction is a common reaction. You can't deny that but that's not the law. That may be the reaction you come into the courtroom [with], but as I said before, we have to set aside those personal beliefs or opinions that we have that conflict with the law that I'm going to give you. The question is, is there any one of you who cannot follow the law that I've just read to you?

JUROR JAMES METZLER: Well, I would have a hard time believing that he was innocent if he didn't take the stand and tell me he wasn't [sic] innocent. That's just my own belief.

THE COURT: Well, I understand that, sir. And I said you're certainly entitled to that belief, and you're not the only person with that belief. But the

488

United States Constitution and the Constitution of the State of Wisconsin give every person the right not to testify and the right that [sic] cannot be held against them if they choose not to do so. That's a right that you have, that I have, everybody has, including the defendants. So we have to honor that right.

The question is your opinion so strong or your belief so strong you're not willing to set those aside for the purpose of this case and follow the law that I've given you?

JUROR JAMES METZLER: Well, I would certainly try to set it aside.

THE COURT: Miss Clark?

JUROR M.C. CLARK: I would try to set it aside, but I'm not sure I could completely set that aside if that would be in the back of my mind that they didn't take the stand. That would be kind of back there knowing that, you know—

THE COURT: Well, obviously, if you're in there and the person hasn't taken the stand, we can't make you draw a blank.

JUROR M.C. CLARK: Right.

THE COURT: The thing you have to do is not use that against the defendant. You have to decide the case on the evidence as it comes out in the courtroom, not things that didn't happen. That's the point. Can you do did [sic] that?

JUROR M.C. CLARK: I'm not so sure I could.

THE COURT: Mr. Metzler, can you?

JUROR JAMES METZLER: Probably.

THE COURT: You don't think you could, Miss Clark?

JUROR M.C. CLARK: I certainly would try, but it would be, you know, I guess still it would always be there. I would try.

THE COURT: Counsel?

MR. FITZGERALD: Well, I guess I feel we're getting low on jurors, but I would move to relieve Mr. Metzler and Miss Clark.

THE COURT: I'm not removing Mr. Metzler. He said he could do this. I'm concerned about Miss Clark.

¶ 8. The circuit court continued to question Clark to determine if she could set aside her feelings. When Clark ultimately stated that she "would have a hard time that they didn't testify," the court excused her and proceeded with the voir dire examination accordingly. Following the examination, Ferron used one of his two peremptory strikes to remove Metzler from the jury panel. *See* Wis. Stat. § 972.03 (limiting Ferron's challenges to 2 in this case).

¶ 9. On March 27, 1996, Ferron was convicted of party to the crime of burglary. On appeal, Ferron argued that the circuit court committed reversible error when it refused to strike Metzler for cause, because Metzler exhibited a bias against defendants who decline to testify. According to Ferron, the circuit court's action compelled him to exercise one of his statutorily granted peremptory challenges to correct the court's error, thereby depriving him of his right to due process under state law. The State asserted that Metzler did not exhibit a manifest bias, and that the circuit court's determination should therefore be upheld.

¶ 10. The court of appeals held that the circuit court erroneously exercised its discretion by failing to strike Metzler for cause because his answers revealed

that he was not indifferent as required by Wis. Stat. § 805.08(1).[3] *See Ferron*, 214 Wis. 2d at 276. The court of appeals also held that the circuit court failed to follow the directive in *Nyberg v. State*, 75 Wis. 2d 400, 249 N.W.2d 524 (1977), that a motion to strike a juror for cause must be granted whenever the court reasonably suspects that circumstances outside the evidence will influence the juror. *See id.* Because these errors compelled Ferron to use one of his peremptory strikes to correct the circuit court's error, the court of appeals held that Ferron's right to due process had been violated, reversed the circuit court's judgment, and remanded for a new trial in accordance with *Ramos*, 211 Wis. 2d 12.

¶ 11. On December 16, 1997, this court granted the State's petition for review. With substantial modifications to its reasoning, we now affirm the court of appeals' decision.

I.

¶ 12. We first consider the standard of review which appellate courts should employ upon review of a circuit court determination that a prospective juror can be impartial. The parties agree that "[t]he question of whether a prospective juror is biased and should be dismissed from the jury panel for cause is a matter of

---

[3] Wisconsin Stat. § 805.08(1) provides in pertinent part:

**805.08 Jurors. (1)** QUALIFICATIONS, EXAMINATION. The court shall examine on oath each person who is called as a juror to discover whether the juror is related by blood or marriage to any party or to any attorney appearing in the case, or has any financial interest in the case, or has expressed or formed any opinion, or is aware of any bias or prejudice in the case. If a juror is not indifferent in the case, the juror shall be excused. . . .

the circuit court's discretion." *Ramos*, 211 Wis. 2d at 15 (quoting *State v. Gesch*, 167 Wis. 2d 660, 666, 482 N.W.2d 99 (1992)). They disagree, however, as to the appropriate standard to be employed upon review of the circuit court's discretionary decision. A determination of the appropriate standard of review is a question of law. Therefore we review this question independently and without deference to the decision of the court of appeals. *See Wyss v. Albee*, 193 Wis. 2d 101, 109, 532 N.W.2d 444 (1995).

¶ 13. As mentioned, the court of appeals concluded that the circuit court's failure to strike Metzler for cause constituted reversible error for two reasons. First, the court concluded that "[t]he trial court erroneously exercised its discretion by failing to follow the directive in § 805.08(1), STATS., to excuse a juror who is not indifferent. . . ." *Ferron*, 214 Wis. 2d at 276. Although the parties disagree as to the court of appeals' ultimate conclusion on this matter, they do not disagree over the court of appeals' use of Wis. Stat. § 805.08(1) to reach that result.

¶ 14. The court of appeals also held that the circuit court's failure to follow "the *Nyberg* requirement that a motion to remove for cause be granted when the court reasonably suspects that circumstances outside the evidence will influence the juror," *id.*, constituted reversible error. It is the court of appeals' reliance upon *Nyberg*, 75 Wis. 2d 400, which serves as the primary catalyst to the parties' arguments before this court.

¶ 15. According to the State, the "reasonable suspicion" language set forth in *Nyberg*, 75 Wis. 2d at 404, is dictum. The appropriate standard of review is set forth in *State v. Louis*, 156 Wis. 2d 470, 457 N.W.2d 484 (1990), which indicates that an appellate court may

overturn the circuit court's denial of such motions only when the juror's bias is "manifest."

¶ 16. Ferron disagrees, and concludes that appellate courts must undertake a two-step analysis upon review of determinations of juror impartiality. According to Ferron, the party seeking to overturn the circuit court's determination must establish: (1) that the challenged juror exhibited a manifest bias in accordance with *Louis*; and (2) that the record evidences grounds to reasonably suspect that the juror could not set the bias aside in accordance with *Nyberg*. Ferron contends that this case involves only the second issue: whether Metzler could set aside his admitted bias against defendants who choose not to testify. Therefore, Ferron asserts that the court of appeals applied the proper standard of review—one of "reasonable suspicion."

¶ 17. For the reasons set forth below, we agree with the State and therefore reject Ferron's interpretation of the case law. We begin by examining the "reasonable suspicion" language upon which Ferron relies.

### A.

¶ 18. In *Nyberg*, the defendant argued on appeal from his conviction of delivery of a controlled substance that the circuit court erroneously exercised its discretion by not striking three jurors for cause because of bias shown at the voir dire examination. *See Nyberg*, 75 Wis. 2d at 402–403. The court noted first that to require dismissal of a prospective juror for cause, there must be more than a suggestion of partiality—the appropriate question for a panel member is whether the prospective juror believes that he or she can decide the case fairly on the evidence. *See id.* at 404 (citations omitted).

493

¶ 19. The *Nyberg* court went on to state that "[a] trial court *must* honor challenges for cause whenever it may reasonably suspect that circumstances outside the evidence may create bias or appearance of bias." *Id.* at 404 (emphasis added) (citing *Nolan v. Venus Motors, Inc.*, 64 Wis. 2d 215, 223, 218 N.W.2d 507 (1974)). Because the "[p]anel members were dismissed. . .because they believed they could not decide the case fairly on the evidence," the *Nyberg* court upheld the circuit court's discretionary act. *See id.* at 405.

¶ 20. The "reasonable suspicion" language upon which Ferron relies finds its roots in *Kanzenbach v. S.C. Johnson & Son, Inc.*, 273 Wis. 621, 79 N.W.2d 249 (1956).[4] In *Kanzenbach*, we stated:

> The trial judge has a wide discretion in determining the qualifications of the jurors. He was satisfied that these jurors were competent and fair. We cannot hold that in these instances his rulings abused a sound discretion nor does the verdict lead us to a

---

[4] As mentioned, the *Nyberg* court actually cited *Nolan* for the proposition that courts must honor challenges for cause when they have a reasonable suspicion of juror bias. In turn, however, *Nolan* cited *Kanzenbach* as the source of the language and stated the language itself somewhat differently. *See Nolan v. Venus Motors, Inc.*, 64 Wis. 2d 215, 223, 218 N.W.2d 507 (1974) (stating that the circuit court "should" honor challenges for cause upon a reasonable suspicion of juror bias).

It is also worth noting that *Nolan* explicitly rejected the argument that a party's reasonable suspicion that a juror is or may be partial compels a circuit court to strike that juror for cause. *See id.* at 221–22. Although this conclusion weakens Ferron's position in this case, it admittedly does not address Ferron's precise argument: that a *court's* reasonable suspicion of juror bias compels the court to strike that juror for cause.

> suspicion that prejudice towards the defendants on the part of any juror actually existed. However, because it preserves the appearance as well as the reality of an impartial trial, *it is a good rule* for the trial judge to honor challenges for cause whenever he may reasonably suspect that circumstances outside the evidence may create bias or an appearance of bias on the part of the challenged juror.

*Id.* at 626–27 (emphasis added).

¶ 21. Thus, a review of our case law reveals that the *Nyberg* language upon which Ferron relies underwent the following metamorphosis: it began as "a good rule" for circuit court judges to follow, *see id.*, evolved into a principle which "should" be followed, *see Nolan,* 64 Wis. 2d at 223, and ultimately took the shape of an affirmative and mandatory command to circuit court judges in this state. *See Nyberg,* 75 Wis. 2d at 404.[5]

¶ 22. Today we send the "reasonable suspicion" language back to its place of origin. In so doing, we are mindful that this is not the first time that the *Nyberg* language has been employed by litigants seeking to overturn determinations of juror impartiality. *See, e.g., Booker v. Israel,* 566 F. Supp. 868, 869 (E.D. Wis. 1983); *State v. Gesch,* 163 Wis. 2d 993, 996–97, 473 N.W.2d 152 (Ct. App. 1991), *rev'd* 167 Wis. 2d 660, 482 N.W.2d 99 (1992).

■

¶ 23. As we have done in the past, *see, e.g., Kanzenbach,* 273 Wis. at 627, we caution and encourage the circuit courts to strike prospective jurors for cause when the circuit courts "reasonably suspect"

---

[5] Even this final interpretation of *Nyberg*'s language may be unwarranted. We note that the sentence following the disputed *Nyberg* language referred to the language as a "guideline." *See Nyberg v. State,* 75 Wis. 2d 400, 405, 249 N.W.2d 524 (1977).

that juror bias exists. Our recommendation does not require, however, that an appellate court overturn the circuit court's assessment of a prospective juror's impartiality whenever the appellate record presents a reasonable suspicion that circumstances outside the evidence will influence the juror. *See, e.g., Gesch,* 163 Wis. 2d at 997 ("*Nyberg* does not compel the creation of broad, general rules."). To demand compliance with such a rigid standard would be to undermine the circuit court's discretion during voir dire examinations.

¶ 24. Because the *Nyberg* court inappropriately expanded our prior jurisprudence, that portion of the opinion which states that "[a] trial court must honor challenges for cause whenever it may reasonably suspect that circumstances outside the evidence may create bias or appearance of bias," *see Nyberg,* 75 Wis. 2d at 404, is hereby overruled.[6] We now proceed to elucidate the proper standard of review.

### B.

¶ 25. It is a well-settled principle of law in this state that a determination by a circuit court that a prospective juror can be impartial should be over-

---

[6] Because *Nolan* merely suggested that circuit courts "should" follow the reasonable suspicion guideline, we adhere to that decision. *See Nolan,* 64 Wis. 2d at 223.

Ferron also argues that *State v. Traylor,* 170 Wis. 2d 393, 489 N.W.2d 626 (Ct. App. 1992) involved the specific issue in this case—whether an admittedly biased juror can set aside that bias—and employed the "reasonable suspicion" standard in doing so. We disagree. *Traylor* involved assertions of ineffective assistance of counsel for failing to move to strike certain jurors for cause. *See id.* at 397–401. It fails to mention, much less apply, a "reasonable suspicion" standard.

turned only where the prospective juror's bias is "manifest." *See, e.g., State v. Messelt*, 185 Wis. 2d 254, 269, 518 N.W.2d 232 (1994); *Louis*, 156 Wis. 2d at 478–79; *Hammill v. State*, 89 Wis. 2d 404, 416, 278 N.W.2d 821 (1979); *State v. Delgado*, 215 Wis. 2d 16, 25, 572 N.W.2d 479 (Ct. App. 1997).

¶ 26. The United States Supreme Court has frequently ruled to the same effect. *See, e.g., Patton v. Yount*, 467 U.S. 1025, 1031–32 (1984); *Irvin v. Dowd*, 366 U.S. 717, 723–24 (1961); *Holt v. United States*, 218 U.S. 245, 248 (1910); *Ex Parte Spies*, 123 U.S. 131, 179–80 (1887); *Reynolds v. United States*, 98 U.S. 145, 155–57 (1878).

¶ 27. We see no reason to depart from this accepted standard of review.[7] The requirement that juror bias or circuit court error be "manifest" before it is overturned is appropriate because the circuit court has the opportunity to observe the prospective juror's attitude and disposition during the voir dire examination. To the contrary, the appellate courts which attempt to make their own assessments of a prospective juror's impartiality must do so from the cold, typewritten words of an appellate record. *See Reynolds*, 98 U.S. at 156–57 ("[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record."). As we have stated, adoption of the "reasonable suspicion" standard advocated by Ferron would do away with the circuit court's broad discretion in this area of law.

---

[7] Contrary to Ferron's assertions, the determination of juror impartiality does not require a two-step approach. A juror's ability to set aside his or her bias is, as the State contends, "part and parcel" of the manifest bias inquiry.

## C.

¶ 28. We acknowledge that "[i]mpartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." *United States v. Wood*, 299 U.S. 123, 145–46 (1936). Nevertheless, we are persuaded to further clarify the manifest bias standard because we recognize that our recent decision in *Ramos* compels the circuit courts to more carefully scrutinize challenges for cause. *See generally Ramos*, 211 Wis. 2d 12 (holding that the use of a peremptory challenge to correct a circuit court's error of law for failure to strike a juror for cause is adequate grounds for reversal).

¶ 29. Accordingly, we hold that a prospective juror's bias is "manifest" whenever a review of the record: (1) does not support a finding that the prospective juror is a reasonable person who is sincerely willing to put aside an opinion or prior knowledge; or (2) does not support a finding that a reasonable person in the juror's position could set aside the opinion or prior knowledge.

¶ 30. Adopting this approach serves two purposes. With a focus on prospective jurors' subjective willingness to set aside their biases, the first prong of this approach accounts for the circuit court's superior position to assess the demeanor and disposition of prospective jurors. The second prong allows the appellate courts to determine whether under the particular circumstances surrounding the voir dire examination, no reasonable juror could put aside the bias or opinion which is revealed by the record. *See, e.g., Gesch*, 167

Wis. 2d at 667 (concluding that prospective jurors who are related to a state witness by blood or marriage to the third degree must be struck from the jury panel on the basis of implied bias).

## II.

■

¶ 31. Having clarified the appropriate standard to be employed upon review of a circuit court's determination that a prospective juror can be impartial, we apply that standard to the facts of this case. As we have stated, "[t]he question of whether a prospective juror is biased and should be dismissed from the jury panel for cause is a matter of the circuit court's discretion." *Ramos*, 211 Wis. 2d at 15 (citation omitted). "This court will find an erroneous exercise of discretion if a circuit court's discretionary decision is based on an error of law." *Id.* at 16.

■

¶ 32. In Wisconsin, a juror who "has expressed or formed any opinion, or is aware of any bias or prejudice in the case" must be struck from the panel for cause. Wis. Stat. § 805.08(1). "If a juror is not indifferent in the case, the juror shall be excused." *Id.* We have previously stated that "[e]ven the appearance of bias should be avoided." *Louis*, 156 Wis. 2d at 478.

¶ 33. In this case, a review of the relevant dialogue between the court, counsel for the defendants, and the prospective jurors will illustrate that the circuit court committed an error of law by failing to strike Metzler for cause.

¶ 34. The relevant voir dire examination in this case began with Attorney Fitzgerald's questions regarding possible bias based on the defendant's choice not to testify. Metzler responded, "Well, if your client is

innocent, why wouldn't he take the stand?" In reply, Fitzgerald informed Metzler of a criminal defendant's constitutional right to elect not to testify.

¶ 35. Apparently unpersuaded, Metzler again asked, "Well, if he's innocent, why wouldn't he go up there and tell us he's innocent?" This answer led Fitzgerald to offer a more detailed explanation of a criminal defendant's right to decline to testify on his own behalf. When asked again whether Metzler would hold his bias against Ferron, Metzler responded, "I think I may."

¶ 36. At this point, the court stepped in to inform the prospective jurors of a criminal defendant's "absolute constitutional right not to testify" which "must not be considered by you in any way and must not influence your verdict in any manner." Following a brief exchange with prospective juror M.C. Clark, the court instructed the jury panel on the law a second time.

¶ 37. Despite the court's detailed instructions, Metzler continued to express his belief that criminal defendants who elect not to testify on their own behalf are guilty of wrongdoing. He added, "Well, I would have a hard time believing that he was innocent if he didn't take the stand and tell me he wasn't [sic] innocent. That's just my own belief."

¶ 38. Although Metzler later stated that he "would certainly try to set [his bias] aside," the record indicates that the circuit court was not satisfied with this answer, and continued to question Metzler regarding his ability to serve as an impartial juror. Metzler's final response indicated that he "[p]robably" could set his bias aside.

¶ 39. In all, the discussion regarding Ferron's Fifth Amendment right to be free from self-incrimination produced four pages of dialogue in the record, which included two instructions on the law from

defense counsel and four instructions from the court. Yet in the end, the most the circuit court was able to ascertain as to Metzler's willingness to set aside his obvious bias against defendants who choose not to testify on their own behalf was "[p]robably."

¶ 40. We emphasize that questions as to a prospective juror's sincere willingness to set aside bias should be largely left to the circuit court's discretion. There are no magical words that need be spoken by the prospective juror, and the juror need not affirmatively state that he or she can "definitely" set the bias aside. Suffice it to say that without the appropriate follow-up questions by the circuit court, a juror's final word of "probably" is insufficient to indicate a sincere willingness to set aside his or her bias against parties who choose to exercise their constitutional rights.[8]

¶ 41. Indeed, that Metzler's explicit bias was hinged upon Ferron's Fifth Amendment right to be free from self-incrimination is of considerable importance in this case. As the United States Supreme Court has stated, the Fifth Amendment privilege against compulsory self-incrimination:

> reflects a complex of our fundamental values and aspirations, and marks an important advance in the development of our liberty. It can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory, and it protects against any disclosures which the witness reasona-

---

[8] For example, an appropriate follow-up question in these instances would be, "Will you follow the law?" If the juror gives an answer which indicates a less-than sincere willingness to put aside all biases and apply the law in that particular case, that juror must be struck from the panel for cause.

bly believes could be used in a criminal prosecution or could lead to other evidence that might be so used. This Court has been zealous to safeguard the values which underlie the privilege.

*Kastigar v. United States*, 406 U.S. 441, 444–45 (1972) (footnotes omitted). Although we do not decide the issue, our decision in this case may have been different—given the same record—had Metzler exhibited a bias which did not conflict with such an essential constitutional right.[9]

---

[9] The dissents by Justice Geske and Justice Bradley both stress the importance of this case and forcefully contend that we have removed the discretion of the trial judges in this state. *See generally* Justice Geske's dissent; Justice Bradley's dissent. We disagree, and emphasize that the circuit courts retain wide discretion in this area of law. The prospective juror's responses in this case were simply insufficient to indicate a sincere willingness to abide by the United States Constitution in deciding Ferron's fate.

To this same end, both dissents argue that we give the circuit courts no guidance as to what will be deemed sufficient responses by prospective jurors during voir dire examinations. *See* Justice Geske's dissent at 508 ("The majority gives no guidance to trial judges as to where their discretion ends."); Justice Bradley's dissent at 512 ("The majority opinion leaves circuit courts and appellate courts with no guidance as they venture to guess what this majority will deem sufficient in future cases."). In doing so, the dissents are internally inconsistent.

Adopting a standard in this case, or giving extensive "guidance" to the circuit courts would do away with their discretion—a result which the dissents emphatically disavow. We decline to set forth a definitive test which draws the line between those answers which are acceptable and those which are not because, quite frankly, there is no such test.

██

¶ 42. During voir dire examinations, the circuit courts are advised to establish a thorough record which sets forth the court's rationale for denying a motion to strike a juror for cause. The circuit courts are also advised to err on the side of striking prospective jurors who appear to be biased, even if the appellate court would not reverse their determinations of impartiality. *See, e.g., Kanzenbach,* 273 Wis. at 627. Such action will avoid the appearance of bias, and may save judicial time and resources in the long run.

¶ 43. We pause to note the inherent difficulties with voir dire examinations. In attempting to ascertain the sincerity of a prospective juror's willingness to set aside an opinion, bias or prior knowledge, circuit courts should refrain from badgering the prospective juror, or from giving the appearance that it is doing so.[10] Even the appearance of such assertiveness by the court is likely to alter the demeanor, inflection and answers which that particular panel member, and others around him or her, may give to voir dire questions.

██

¶ 44. Because Metzler's lack of sincere willingness to set aside his bias illustrates that he was not "indifferent in the case" as required by Wis. Stat. § 805.08(1), we conclude that the circuit court committed an error of law, and thereby erroneously exercised its discretion, in denying the motion to strike Metzler for cause. *See, e.g., State v. Zurfluh,* 134 Wis. 2d 436, 439, 397 N.W.2d 154 (Ct. App. 1986) (holding that the circuit court's failure to follow statutory direction constitutes an error of law, and an erroneous exercise of discretion). Before determining the appropriate rem-

---

[10] We emphasize that there is no evidence in this record to suggest that the circuit court engaged in such conduct.

edy for such an error of law, we first address the State's request to overrule our recent decision in *Ramos*.

## III.

¶ 45. In *Ramos*, we held that the use of a peremptory challenge to correct a circuit court error for failure to strike a juror for cause is adequate grounds for reversal because it arbitrarily deprives the defendant of a statutorily granted right. *See Ramos*, 211 Wis. 2d at 24–25. For various reasons which we need not examine in detail, the State asks this court to "reconsider" that decision. We decline to do so.

¶ 46. Put simply, the ink has yet to dry on our decision in *Ramos*. Were we to overrule *Ramos*, we find it no great leap of faith to suggest that public confidence in the judiciary would be diminished. Moreover, both parties in this case appear to agree that bench and bar alike have attempted to familiarize themselves with *Ramos*, and have taken steps to comply with its holding. In a society which depends upon the rule of law, reliance upon judicial decisionmaking forms the centerpiece of our legal culture.

¶ 47. As the United States Supreme Court has stated, "*[s]tare decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991).

¶ 48. "[A]ny departure from the doctrine of *stare decisis* demands special justification." *Arizona v. Rumsey*, 467 U.S. 203, 212 (1984). The State provides no "special" or compelling justification to overturn our decision. Instead, it repeats much of the argument it

presented in *Ramos*, and even asks the court to reconsider the rationale set forth in the *Ramos* dissent.

¶ 49. The path upon which the State would have us travel is uncertain and precarious. By adhering to our decision in *Ramos*, we choose a path which may not always lead to infallible results, but which certainly provides more stable and predictable footing for the future.

## IV.

¶ 50. Because Ferron was compelled to use one of his statutorily granted peremptory challenges to correct the circuit court's error of law, his conviction must be reversed, and the cause remanded for a new trial in accordance with our decision in *Ramos*, 211 Wis. 2d 12. Therefore, the decision of the court of appeals is modified as to its use of an inappropriate standard of review, and as modified, the decision is affirmed.

*By the Court.*—The decision of the court of appeals is modified, and as modified, affirmed.

¶ 51. WILLIAM A. BABLITCH, J. (*concurring*). I join the majority opinion, and write only to answer the dissenting opinions of Justice Geske and Justice Bradley.

¶ 52. Both dissents take the position that the response of juror Metzler of "probably" was good enough. It was not good enough when taken in context.

¶ 53. The issue to which the juror was asked to respond was whether he would afford the defendant the rights due him under the Fifth Amendment to the U.S. Constitution. Thus, his answer was, in reality, "I probably will grant the defendant his rights under the Fifth Amendment." That is not the juror's choice. He

*must* afford the defendant his rights under the Constitution. He either will or he won't, not "probably;" that term connotes the potential that he will not.

¶ 54. Further exacerbating the issue is that the juror's response did not appear in a vacuum. His response of "probably" came only after a number of colloquies between counsel for the defendant, the circuit court, and the juror. These colloquies are well documented in the majority opinion, but they include statements from juror Metzler such as " Well, if your client is innocent, why wouldn't he take the stand?"; "Well, if he's innocent, why wouldn't he go up there and tell us he's innocent?"; "I think I may." (in response to a question of whether he would hold the defendant's failure to take the stand against the defendant); "Well, I would have a hard time believing that he was innocent if he didn't take the stand and tell me he wasn't [sic] innocent."; "Well, I would certainly try to set it aside."; and then, "Probably."

¶ 55. The circuit court, at the conclusion of all this, stated: "I'm not removing Mr. Metzler. He said he could do this." The court, respectfully, was in error. Mr. Metzler did not say he could do this. He said, "Probably." Following what preceded this, it was not good enough.

¶ 56. We are not here dealing with whether a juror can accept the court's instructions on some mundane area of the law. We are dealing with fundamental rights. The majority's conclusion is absolutely correct.

¶ 57. I am authorized to state that Justice Donald W. Steinmetz and Justice N. Patrick Crooks join this concurrence.

¶ 58. JANINE P. GESKE, J. (*dissenting*). I join Part I of Justice Bradley's dissent. I write separately to express my deep concern that the majority has substantially and inappropriately restricted the circuit court's discretion during the voir dire process. In almost every serious felony case, honest prospective jurors express concerns about the heinous factual allegations, the presumption of innocence, a prior record, other acts testimony, a defendant's option not to testify, evaluating a police officer's testimony in the same manner as other witnesses, or the victimization of a child, elderly or disabled person. We encourage trial judges to explore those fears, biases, and natural reactions with the members of the prospective jury panel. Few people can honestly tell the court that they are bothered by some of these factors in the case and then absolutely, without equivocation, reassure the judge that they are certain they can disregard their concerns. Most honest people can only commit that they will do their best to be fair. The trial judge must then, based upon his or her own assessment of that person's sincerity and ability to be fair, decide whether that person is qualified to sit on that particular case.

¶ 59. Judge Naze conducted just such a discussion and assessment here. He concluded, based upon what he heard and observed, that the juror could be fair. The majority disagrees with Judge Naze's assessment. Instead, the majority concludes that Mr. Metzler, whom none of us on this court ever heard or observed, maintained a manifest bias and could not be a fair juror. Exchanges like the one between Judge Naze and juror Metzler occur in Wisconsin courtrooms every day. Trial judges, in both civil and criminal cases, routinely make the type of assessment that Judge Naze did here. Whether any of us on this court may have

made the same discretionary call as Judge Naze is not relevant to our discussion. That judgment call belonged to the trial judge in the courtroom and not to us in the supreme court conference room reading bare words on a transcript.

¶ 60. In this opinion the majority has, in effect, told the circuit courts that appellate courts are in a better position to make this judgment call. The majority gives no guidance to trial judges as to where their discretion ends. Because of this decision, the court of appeals must now assume the new task of looking at the answers of prospective jurors on cases which have already been tried, to reach an appellate court assessment of whether a juror should have been struck for cause. This court should have left that discretion where it belongs—in the hands of the trial judges.

¶ 61. ANN WALSH BRADLEY, J. (*dissenting*).

What I want to stress is the importance of this case. I think that this is the most important case that I have ever had. I haven't been a lawyer forever, about 15 years at this, but this is by far the most important case I've ever had. This case affects not only criminal cases, but it affects civil cases. We're talking about the finality of verdicts.

¶ 62. As noted by the assistant attorney general at oral argument, the important issue in this case affects the finality of verdicts. In addressing the issue of the appropriate standard of appellate review of a circuit court's determination that a prospective juror can be impartial, the majority concludes that the manifest bias standard should be applied. While I agree with the standard adopted by the majority, as it acknowledges a circuit court's more advantageous posi-

tion for evaluating a voir dire, I believe the majority errs in the application of the standard in this case.

## I.

¶ 63. An appellate court may overturn a circuit court's determination of juror impartiality only where a review of the record shows that a juror's bias is "manifest." *See State v. Louis*, 156 Wis. 2d 470, 478–79, 457 N.W.2d 484 (1990). In interpreting this language, the majority adopts the test for manifest bias offered by the State. That test indicates that manifest bias will not exist where the record shows that a prospective juror is a reasonable person who is sincerely willing to put aside an opinion or prior knowledge and that a reasonable person in the juror's position could set aside the opinion or prior knowledge.

¶ 64. While I agree with the test adopted by the majority, I disagree with the court's application of that test here. In reversing the circuit court, the majority claims that the record does not indicate that the challenged juror in this case, Metzler, was sincerely willing to put aside his potential bias against a defendant that does not testify. However, this is not a case where the record indicates that a potential juror refused to put aside a procedural bias. This is also not a case where the circuit court ignored counsel's concern about a potential juror. Rather, this is a case where, based on extensive questioning, legal instruction, and first-hand assessment of Metzler's comments, the circuit court determined that the juror was willing to put aside his bias.

¶ 65. In exercising appellate review over decisions effectively requiring a credibility determination of a prospective juror, this court must acknowledge that a cold record cannot adequately convey indicia of

sincerity. The reason for this is simple: you cannot talk sincerity, you communicate sincerity. Appellate review of the record by and large is limited to a review of the talk. The communication available for the circuit court to assess includes seeing the body language, hearing the inflection, experiencing the hesitancy, pauses, or certainty of the statement.

¶ 66. The record indicates that Metzler expressed doubts about the defendant's motivations in failing to testify. In response, defense counsel and the circuit court instructed the voir dire pool on the defendant's constitutional rights. The circuit court then asked if Metzler was "willing to set those [doubts] aside for the purpose of this case and follow the law?" Metzler replied, "Well, I would certainly try to set it aside."

¶ 67. After further questioning of another prospective juror, the court advised that "[t]he thing you have to do is not use that against the defendant. You have to decide the case on the evidence as it comes out in the court room, not things that didn't happen. That's the point. Can you do did [sic] that?" Metzler responded, "Probably." When defense counsel asked the court to remove Metzler from the jury pool, the court stated, "I'm not removing Mr. Metzler. He said he could do that."

¶ 68. Based on this colloquy, and focusing particularly on Metzler's use of the word "Probably," the majority determines that Metzler maintained a manifest bias against the defendant. In so doing, the majority violates its own test. The majority emphasizes that evaluating a prospective juror's sincerity is best left to the circuit court and declares that there are no magical words or "affirmative[ ] state[ments]" that a juror need make to indicate impartiality, and that there is no "definitive test which draws the line

between those answers which are acceptable and those which are not. . . ." Majority op. at 501–02 n.9. Yet, based on one word, "Probably," the majority reverses the circuit court's first-hand evaluation of the prospective juror's ability to judge the defendant impartially.

¶ 69. In reaching this conclusion, the majority requires that which it disclaims—a definitive affirmative statement indicating that the potential juror is able and willing to set aside any bias against a defendant who does not testify. Yet, faced with a daunting and legalistic question like, "Can you put aside all bias," I submit that the average voir dire participant will respond with a qualified affirmative instead of the unambiguous declaration that the majority seems to require.

¶ 70. The majority asserts that Metzler's response that he "probably" could base his decision solely on the evidence leaves the court with an equivocation. The majority concludes that the response is "insufficient to indicate a sincere willingness to set aside his or her bias. . . ." Majority op. at 501. Such a conclusion is incorrect. Contrary to the majority's discomfort with Metzler's "probably," no precedent of this court indicates that "probably" is unacceptable equivocation.

¶ 71. Our jurisprudence is replete with examples in which we rely on a standard of probability: we make arrests, issue warrants and commit individuals to mental institutions upon a showing of probable cause; the opinion of an expert founded upon a reasonable degree of probability is a sufficient basis upon which to award millions of dollars in complex cases. Yet, the majority disparages a juror's use of "probably," and on that basis elevates its assessment of a prospective juror's sincerity above that of the circuit court.

¶ 72. In an attempt to narrow the scope of its conclusion, the majority makes its result dependent upon the Fifth Amendment right against self-incrimination, even going so far as to state that "our decision in this case may have been different—given the same record—had Metzler exhibited a bias which did not conflict with such an essential constitutional right." Majority op. at 502. While I acknowledge the importance of the Fifth Amendment, the majority's reliance upon it to justify its result in this case appears to be an arbitrary exercise. It precludes circuit courts from eliciting any guidance whatsoever from the majority analysis which could serve to explain why the majority overrules the circuit court's decision in this case.[1]

¶ 73. The majority opinion leaves circuit courts and appellate courts with no guidance as they venture to guess what this majority will deem sufficient in future cases. Compounding this lack of direction is the severity of the consequences if they guess incorrectly—jeopardizing the finality of verdicts.

¶ 74. The circuit courts and appellate courts are left to wonder if the word "probably" is sufficient. Initially, discussion in the majority opinion seems to suggest it would not be sufficient. Yet, the opinion subsequently equivocates and suggests it "may" be

---

[1] The majority confuses this point, alleging that the dissents are internally inconsistent. The majority also mistakenly equates a call for guidance with a request for a bright-line rule. I espouse no bright-line "magic" words. Quite to the contrary, I continue to strongly believe that the circuit courts are best left to assess the sincerity of a prospective juror. However, if the majority is going to take the ill-advised tactic of usurping the circuit court's entirely acceptable decision in this case, then the majority must provide our courts with some sort of guidance by which to examine future cases.

sufficient if there is no conflict with "such a constitutional right." Courts will be left to wonder: why should a Fifth Amendment constitutional right be elevated above and considered more essential than other constitutional rights?

¶ 75. In holding the Fifth Amendment up for special treatment in the voir dire analysis solely to justify the court's errant conclusion, the majority opinion ignores the more encompassing fundamental constitutional right with which this case really deals—the defendant's right to a fair trial. Because courts must act to preserve the defendant's constitutional right to a fair trial, whether the alleged bias against the defendant is based on personal attributes such as race or on legal attributes such as the defendant's invocation of the Fifth Amendment, exaltation of the Fifth Amendment considerations over other aspects of the fair trial constitutional guarantee appears, and is, arbitrary.

¶ 76. The majority also missteps when it concludes that it is in a better position than is the circuit court to assess a prospective juror's credibility and sincerity. We should reserve imposing our own view of the record to those cases where the circuit court's interpretation has no support in the record or where the circuit court ignores its duties. Accordingly, I dissent from the majority's conclusion that the circuit court as a matter of law erroneously exercised its discretion.

## II.

¶ 77. Additionally, I note that this court is again faced with reversing a conviction based on *State v. Ramos*, 211 Wis. 2d 12, 564 N.W.2d 328 (1997). The court takes this action not because the defendant has demonstrated that the jury impaneled in his criminal case was anything other than fair and impartial, but

rather because of *Ramos'* ruling that the "trial court's failure to dismiss the challenged juror for cause effectively deprived [the defendant] of the right to exercise all seven of his statutorily granted peremptory challenges." *Ramos*, 211 Wis. 2d at 24.

¶ 78. As the dissent in *Ramos* succinctly noted, statutory peremptory challenges exist not to allow defendants to randomly shuffle a jury pool in their favor, but rather to ensure the impaneling of an impartial jury as a component of our constitutional guarantee of a fair trial. *See Ramos*, 211 Wis. 2d at 33 (Crooks, J. dissenting)(citing *Georgia v. McCollum*, 505 U.S. 42, 57 (1992) and *Ross v. Oklahoma*, 487 U.S. 81 (1988)). When a defendant exercises a peremptory challenge to strike a juror who should have been excused by the court for cause, the defendant also acts to ensure that an unbiased trier of fact considers the case.

¶ 79. However, under *Ramos*, even where the defendant has failed to establish that a jury panel was anything other than fair and impartial, the defendant's conviction must be reversed if the defendant was forced to use a peremptory challenge to excuse a juror who should have been excused for cause. *See Ramos*, 211 Wis. 2d at 24–25. Such a result seems contrary to a significant body of Wisconsin case law. *See State v. Traylor*, 170 Wis. 2d 393, 489 N.W.2d 626 (Ct. App. 1992); *Bergman v. Hendrickson*, 106 Wis. 434, 82 N.W. 304 (1900); *Pool v. Milwaukee Mechanics' Ins. Co.*, 94 Wis. 447, 69 N.W. 65 (1896); *Carthaus v. State*, 78 Wis. 560, 47 N.W. 629 (1891).

¶ 80. Although *Ramos* is a recent decision of this court, its rationale is no more correct today than it was one year ago when it was decided. While I agree that the doctrine of stare decisis deserves great weight in

our jurisprudence, it seems incongruous to refuse to reconsider the decision solely on stare decisis grounds when, as noted above, *Ramos* itself disregarded a line of precedent spanning over a century in reaching its conclusion. While I acknowledge that it is currently controlling authority, I continue to believe *Ramos* was incorrectly decided.

¶ 81. I am authorized to state that JANINE P. GESKE, J. joins Part I of this opinion.