COURT OF APPEALS
DECISION
DATED AND FILED

June 10, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP2060-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF1171

IN COURT OF APPEALS
DISTRICT I

---

STATE OF WISCONSIN,

       PLAINTIFF-RESPONDENT,

  V.

MARCEL ANTONIO JELKS,

       DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JEFFREY A. WAGNER, Judge. *Affirmed*.

Before White, C.J., Donald, P.J., and Geenen, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  Marcel Antonio Jelks appeals a judgment entered following a jury trial convicting him of two felonies and a misdemeanor, as well as an order denying his postconviction motion.  On appeal, Jelks challenges the sufficiency of the evidence and contends that he was deprived of the effective assistance of counsel.  We reject Jelks's arguments and affirm.

## BACKGROUND

¶2     Jelks was criminally charged with three counts: (1) child neglect, resulting in death, as a party to a crime and a repeater; (2) felon in possession of a firearm, as a repeater;[1] and (3) possession with intent to deliver a controlled substance (THC), as a repeater.  In short, according to the complaint, on March 10, 2018, Jelks and his significant other, Talisha Lee, left their six young children home alone while they went shopping.  While Jelks and Lee were gone, their nine-year-old daughter, Melissa, obtained a firearm and was shot in the neck by her ten-year-old brother, Melvin.[2]  Melissa died as a result of complications from the gunshot wound.  During the search of the residence following the shooting, officers recovered 161.30 grams of marijuana.

¶3     Jelks proceeded to trial.  Relevant to this appeal, during the trial, the State called several witnesses, including Melvin, Lee, several police officers, and a forensic DNA analyst.  Melvin testified that his mother, Lee, brought a gun into the house when his father, Jelks, was not home.  Lee showed the children the gun and the box and told them not to play with the gun or to touch it.  She then put the

---

[1]  Jelks had prior felony convictions.

[2]  For privacy purposes, we refer to the minor children involved in this case using pseudonyms.

gun on the top shelf in her closet. Melvin did not know how his sister had gotten the gun down.

¶4 A heating and air conditioning contractor, who had been dispatched to Jelks's and Lee's residence to repair their furnace, testified that the parents were not home when he arrived. While sitting in his vehicle, he called them on the phone and was told that they were at the store and would return in five to ten minutes. After Jelks and Lee returned, he saw "frantic" children come out to the front porch. Jelks went into the house and moments later came out with "a body over his shoulder, printed dress, blood."

¶5 Lee testified that two days prior to the shooting, on March 8, 2018, she went to a store with friends to purchase a gun. Because the gun store could not process her background check that day, she completed the paperwork and left without a gun. Lee initially testified that Jelks did not go with her to the gun store, but she later admitted that Jelks went with her and waited in the car.

¶6 The following day, on March 9, 2018, Lee went back to the store to pick up her gun. Lee told the children she bought a gun and that they should not touch it. She put the gun, which was loaded, up high in a closet in a box behind her purses. Lee testified that she was unaware of the existence of the trigger lock for the gun and the corresponding keys—both of which were found inside the residence. That evening, Jelks went out and returned home intoxicated. Lee testified that her initial statement to police—that Jelks handed her the gun when he returned home—was a lie. Lee testified that Jelks did not, in fact, handle the gun or load the gun. In addition, Lee initially testified that she did not tell the police that Jelks had obtained bullets for the gun; however, Lee later admitted in her

testimony that she was lying about this and she did tell the police that Jelks obtained the bullets for the gun.

¶7 Lee further testified that on March 10, 2018, the day of the shooting, she and Jelks left their six children alone to go grocery shopping. Ten-year-old Melvin was in charge of the five younger children. The trip took approximately 45 minutes. When they returned, Melvin was outside crying that Melissa got shot. Jelks carried Melissa out of the house and they drove to the hospital where Melissa passed away.

¶8 In addition, the State introduced evidence that swabs of the gun's magazine and of cartridges showed the presence of male DNA.[3] The State also played a videotaped interview in which Lee told police that Jelks got the bullets for the gun and brought them home.

¶9 The jury found Jelks guilty of child neglect as a party to a crime, felon in possession of a firearm, and a lesser included offense of possession of a controlled substance (THC). At sentencing, Jelks, represented by new counsel, received a 20-year global prison sentence broken down into 12 years of initial confinement and 8 years of extended supervision.[4]

¶10 Jelks filed a postconviction motion contending that he received ineffective assistance of counsel. Jelks argued that his trial attorney should have sought to remove an allegedly unfair and biased juror, Juror 3. Jelks additionally

---

[3] There was, however, an insufficient amount of DNA to compare to known profiles.

[4] After the trial, Jelks's attorney moved to withdraw due to retirement, which the trial court granted. Jelks was appointed new counsel.

contended that his sentencing attorney was ineffective for failing to object to the trial court's "inaccurate assumption concerning [Jelks's] alleged irresponsibility and poor decision making concerning the events on the morning of the shooting." In particular, Jelks contended that there was no evidence for the court's references at sentencing that the children were left alone the morning of the incident to "exchange bullets," or "shiver due to the lack of heat[.]" Rather, Jelks argued that he and Lee left the children alone to buy food and had left the children with space heaters and heated blankets.

¶11 The trial court denied Jelks's motion without an evidentiary hearing. The court found that Juror 3 was neither subjectively nor objectively biased. Additionally, the court stated that whether Jelks "was exchanging bullets or not during the same shopping trip while his children were left alone with an unlocked, loaded weapon was not remotely material to this court's sentencing analysis." Further, even if the court's comment about exchanging bullets was error, it was harmless as it would not have changed the sentencing outcome. The court did not specifically address Jelks's reference to the space heaters. This appeal follows.

## DISCUSSION

¶12 On appeal, Jelks challenges the sufficiency of the evidence. Additionally, Jelks renews his postconviction claims that he was deprived of effective assistance of counsel. We address each argument below.

### I. Sufficiency of the Evidence

¶13 Jelks first contends that the evidence was insufficient to convict him of child neglect.

¶14    When reviewing a sufficiency of the evidence claim, we may not substitute our "judgment for that of the trier of fact unless the evidence, viewed most favorably to the [S]tate and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990). We will uphold a conviction "[i]f any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt," and we do so even if we do not believe that the trier of fact should have found guilt based on the evidence. *Id.* Whether the evidence in a case is sufficient to sustain a guilty verdict is a question of law that we review independently. *State v. Smith*, 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410.

¶15    At the conclusion of Jelks's trial, the trial court instructed the jury that child neglect requires that: (1) Melissa was under the age of 18; (2) Jelks was responsible for the welfare of Melissa; (3) Jelks intentionally contributed to the neglect of Melissa; and (4) the death of Melissa was a consequence of Jelks intentionally contributing to the neglect of her. *See* WIS JI—CRIMINAL 2150A (2009). The trial court further advised the jury that "[y]ou cannot look into a person's mind to find intent," and "[i]ntent must be found, if found at all, from all the defendant's acts, words, and statements, if any, and from all the facts and circumstances in this case bearing upon intent." *Id.*

¶16    Jelks contends that the evidence was insufficient to show that he intentionally contributed to the neglect of Melissa. According to Jelks, his "actual

intent" was to safeguard the gun and prevent the children from accessing it, which was supported by the testimony that he told Lee to "put up the gun."[5]

¶17 We disagree that the evidence is insufficient. It is undisputed that on the day of Melissa's death, Jelks left Melissa alone without any adult supervision. Further, based on the evidence presented at trial, the jury could have reasonably found that Jelks obtained bullets for the gun, handled the gun prior to Melissa's death, and failed to take any steps to unload the gun or secure the gun with a trigger lock. While Lee's testimony was confusing and inconsistent with her statements to the police at times, credibility questions are determined by the trier of fact and this court will not overturn a determination of credibility by a jury unless the evidence is inherently or patently incredible. *Poellinger*, 153 Wis. 2d at 504; *State v. Daniels*, 117 Wis. 2d 9, 17, 343 N.W.2d 411 (Ct. App. 1983). Thus, here, we conclude that a jury acting reasonably could find that the State proved beyond a reasonable doubt that Jelks intentionally contributed to the neglect of Melissa. *See Poellinger*, 153 Wis. 2d at 507.

## II. Ineffective Assistance of Counsel

¶18 To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the defendant suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We need not address both prongs of the test if the defendant does not make a sufficient showing on one of the prongs. *Id.* at 697.

---

[5] The other elements of child neglect are not at issue.

¶19　An evidentiary hearing is "required before a court may conclude a defendant received ineffective assistance." *State v. Sholar*, 2018 WI 53, ¶53, 381 Wis. 2d 560, 912 N.W.2d 89; *State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979). When deciding whether a defendant is entitled to an evidentiary hearing, we first independently determine "whether the motion on its face alleges sufficient material facts that, if true, would entitle the defendant to relief." *State v. Ruffin*, 2022 WI 34, ¶27, 401 Wis. 2d 619, 974 N.W.2d 432. "Whether the record conclusively demonstrates that the defendant is entitled to no relief is also a question of law we review independently." *State v. Spencer*, 2022 WI 56, ¶23, 403 Wis. 2d 86, 976 N.W.2d 383 (citations omitted). "If the motion does not raise facts sufficient to entitle the defendant to relief, or if it presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the [trial] court has the discretion to grant or deny a hearing." *Ruffin*, 401 Wis. 2d 619, ¶28.

### A. Juror Bias

¶20　Jelks first contends that his trial attorney was ineffective for failing to move to strike Juror 3, who ultimately sat on the panel.

¶21　"The United States and Wisconsin Constitutions guarantee a criminal defendant the right to a trial by an impartial jury." *State v. Nielsen*, 2001 WI App 192, ¶24, 247 Wis. 2d 466, 634 N.W.2d 325. "Prospective jurors are presumed impartial," and it is the defendant's burden to rebut this presumption. *State v. Gutierrez*, 2020 WI 52, ¶39, 391 Wis. 2d 799, 943 N.W.2d 870 (citations omitted). Trial counsel's failure to object or to further question a juror may be raised as a claim of ineffective assistance of counsel. *State v. Williams*, 2000 WI App 123, ¶21, 237 Wis. 2d 591, 614 N.W.2d 11.

¶22    The Wisconsin Supreme Court has recognized three types of bias: (1) statutory bias; (2) subjective bias; and (3) objective bias. *State v. Lepsch*, 2017 WI 27, ¶22, 374 Wis. 2d 98, 892 N.W.2d 682.  At issue in this case is subjective bias.[6]  Subjective bias turns on "the words and the demeanor of the prospective juror" and "refers to the prospective juror's state of mind." *State v. Faucher*, 227 Wis. 2d 700, 717, 596 N.W.2d 770 (1999).  Thus, "we will uphold the [trial] court's factual finding that a prospective juror is or is not subjectively biased unless it is clearly erroneous." *Lepsch*, 374 Wis. 2d 98, ¶23 (citation omitted).

¶23    During voir dire, the prosecutor observed that the case involved the death of a child and inquired whether any of the jurors felt that "they cannot be fair and impartial on this particular case[.]"  In regards to Juror 3, the following exchange occurred:

> [Prosecutor]: Juror No. 3, hearing the fact that this case involved the death of a 9 year old child, that alone, what leads you to believe you couldn't be fair and impartial in this case?
>
> [Juror 3]: Listening to the news every day and in Milwaukee, I'm hearing about all those other little children that have been killed.  It affects me tremendously knowing that I have little ones too that I worry about.  *I probably don't think I'll be fair with this trial.*
>
> [Prosecutor]: Okay.

---

[6] We note that the postconviction decision addressed both subjective and objective bias. While Jelks references objective bias in his briefs to this court, Jelks does not develop an argument as to why Juror No. 3 was objectively biased.  We will not develop arguments on Jelks's behalf, and accordingly do not address objective bias further. *See State v. Pettit*, 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992) (stating that "[w]e cannot serve as both advocate and judge").

[Juror 3]: *So probably I'll be emotional and not be fair* with—

(Emphasis added.)

¶24    In its postconviction decision, the trial court found that Jelks failed to show that a biased juror served on the panel. The trial court noted that Juror 3 "did not unequivocally state that she could not be fair and impartial." Additionally, at other times, Juror 3 indicated that she could indeed be fair and impartial. Specifically, the trial court noted that Juror 3 "did not raise her hand when asked to indicate if she would not hold the State to its job to prove the case beyond a reasonable doubt" and "did not raise her hand" when asked if she would be unable to put aside any media coverage and to base the verdict solely on evidence presented. The trial court also noted that the prosecutor specifically asked Juror 3 if she understood that a juror's job was only to determine whether the State had proved or not proved the elements and the record showed that Juror 3 "[nodded] affirmatively."

¶25    In support of his argument, Jelks appears to primarily rely on *State v. Ferron*, 219 Wis. 2d 481, 579 N.W.2d 654 (1998),[7] and *State v. Carter*, 2002 WI App 55, 250 Wis. 2d 851, 641 N.W.2d 517. These cases are distinguishable.

---

[7] The State argues that *State v. Ferron*, 219 Wis. 2d 481, 579 N.W.2d 654 (1998), was abrogated by *State v. Lindell*, 2001 WI 108, 245 Wis. 2d 689, 629 N.W.2d 223. We question whether *Ferron* was in fact abrogated in whole or only in part. While *Lindell* rejected the remedy applied in *Ferron*, *Lindell* did not analyze or change the law with respect to whether a juror is subjectively biased. *See id.*, 245 Wis. 2d 689, ¶¶51-52. However, given that we find *Ferron* factually distinguishable, we do not believe it necessary to resolve this question for the purposes of this opinion. *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) ("[C]ases should be decided on the narrowest possible ground[.]").

10

¶26    In *Carter*, a sexual assault case, a prospective juror told the court that his brother-in-law had been sexually assaulted. *Id.*, ¶¶1, 3. The State asked the juror whether this would influence or affect his ability to be fair or impartial and the juror responded "Yes." *Id.* Ultimately, the juror served on the panel and the defendant was convicted. *Id.*, ¶4. We concluded in *Carter* that the defendant was entitled to a new trial because the juror was subjectively biased and trial counsel was ineffective. *Id.*, ¶2. Unlike in *Carter*, here, Juror 3 did not definitively state that she could not be fair and impartial. Rather, Juror 3 indicated that she could "probably" not be fair.

¶27    In *Ferron*, a prospective juror suggested that criminal defendants who elect not to testify on their own behalf are guilty. *Id.*, 219 Wis. 2d at 487-89. Despite a lengthy discussion, which included explanations from counsel and the trial court about a defendant's constitutional right not to testify and the State's burden to prove the case, the juror appeared to maintain his skepticism. Nonetheless, the juror ultimately told the court that he "would certainly try" and could "probably" set aside his bias. *Id.* at 489. The juror's response of "probably" was held to be "insufficient to indicate a sincere willingness" to set aside his bias against the defendant's exercising his constitutional right not to testify. *Id.* at 501. Because the defendant was compelled to use one of his peremptory challenges to strike the juror, our supreme court reversed his conviction and remanded for a new trial. *Id.* at 505. Significantly, the court declined to set forth a definitive line between acceptable and unacceptable answers that indicate subjective bias. *Id.* at 502 n.9. Rather, the court simply concluded that the juror's answers in *Ferron* did not indicate a willingness to set aside his bias. *See id.* at 502-03.

¶28    Here, in contrast to *Ferron*, Juror 3 did not demonstrate or express an inclination that she would have an issue following the law as instructed by the

court. As the trial court observed, Juror 3 "did not raise her hand when asked to indicate if she would not hold the State to its job to prove the case beyond a reasonable doubt" and "did not raise her hand" when asked if she would be unable to put aside any media coverage and to base the verdict solely on evidence presented. The trial court also noted that the prosecutor specifically asked Juror 3 if she understood that a juror's job was only to determine whether the State had proved or not proved the elements and the record showed that Juror 3 "[nodded] affirmatively." While Juror 3 used the term "probably," a prospective juror does not need to "respond to voir dire questions with unequivocal declarations of impartiality." *State v. Erickson*, 227 Wis. 2d 758, 776, 596 N.W.2d 749 (1999) (citation omitted); *see also Gutierrez*, 391 Wis. 2d 799, ¶¶40-42.

¶29 Therefore, we conclude that the trial court properly found that Jelks failed to establish subjective bias. Because Jelks has failed to establish subjective bias, trial counsel was not ineffective for failing to remove Juror 3 from the panel and the trial court properly denied Jelks's claim without a hearing. *See Lepsch*, 374 Wis. 2d 98, ¶27 (concluding that the defendant could not establish ineffective assistance because he could not prove subjective or objective bias); *State v. Wheat*, 2002 WI App 153, ¶30, 256 Wis. 2d 270, 647 N.W.2d 441 (holding that trial counsel was not ineffective for failing to bring a meritless motion).

### B. Sentencing

¶30 Jelks next argues that his sentencing attorney was ineffective for failing to object to the trial court's "inaccurate assumption concerning [Jelks's] alleged irresponsibility and poor decision making concerning the events on the morning of the shooting."

¶31 "A defendant has a constitutionally protected due process right to be sentenced upon accurate information." *State v. Tiepelman*, 2006 WI 66, ¶9, 291 Wis. 2d 179, 717 N.W.2d 1. To prevail on an inaccurate information claim, a defendant must make two showings. First, the defendant must show that the information was inaccurate. *State v. Travis*, 2013 WI 38, ¶21, 347 Wis. 2d 142, 832 N.W.2d 491. Second, the defendant must show by clear and convincing evidence that the court actually relied upon the inaccurate information at sentencing. *Id.*, ¶¶21-22. If the defendant makes these two showings, the burden shifts to the State to show that the error was harmless beyond a reasonable doubt. *Id.*, ¶23.

¶32 Jelks argues that the court inaccurately believed the children had been left alone the morning of the shooting "to exchange bullets." He notes that he told the presentence investigation (PSI) writer that the bullet shopping trip took place "a day or two before the shooting[.]" Jelks, however, has failed to satisfy his burden of proving that the trial court actually relied on inaccurate information. *See id.*, ¶¶21-22. As the trial court observed in its postconviction decision, whether Jelks was exchanging bullets or not while gone from the house was not material. The focus of the court at sentencing was that the children were left alone in the house with an unsecured weapon.

¶33 In addition, Jelks argues that "there had been absolutely no evidence that the parents had left the children alone to shiver due to the lack of heat issue." Jelks asserts that he had purchased heated blankets and propane, and attached the propane to space heaters. Jelks, however, told the PSI writer that on the day of the shooting "all the children were in the living room huddled together sleeping as their heat had been turned off and it was cold in the house." At sentencing, Jelks

was given the opportunity to correct any mistakes in the PSI, and his attorney said there were none.

¶34    Thus, given our rejection of Jelks's inaccurate information argument, it follows that Jelks was not deprived of effective assistance of counsel and the trial court properly denied Jelks's claims without an evidentiary hearing. *See Wheat*, 256 Wis. 2d 270, ¶30.

## CONCLUSION

¶35    In sum, we reject Jelks's argument that the evidence was insufficient to find him guilty of child neglect. Additionally, we reject Jelks's argument that he was deprived of effective assistance of counsel. Therefore, we affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.